IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2013 Session

# STATE OF TENNESSEE v. JEFFREY KRISTOPHER KING[1] and KASEY LYNN KING

**Appeal from the Circuit Court for Rutherford County
and from the Criminal Courts for Davidson and Sumner Counties
Nos. F-63586D, 2010-C-2083, 638-2010
Don R. Ash, Judge, Cheryl Blackburn, Judge, and Dee David Gay, Judge**

---

**No. M2012-00201-CCA-R3-CD - Filed September 24, 2013**

---

Jeffrey King ("Defendant J. King") entered conditional guilty pleas in Rutherford County to one count of conspiracy to sell over seventy pounds of marijuana and one count of possessing over seventy pounds of marijuana; to several counts of felony marijuana offenses and several counts of money-laundering offenses in Davidson County; and to several counts of felony marijuana offenses, several counts of money-laundering offenses, and one count of a felony firearm offense in Sumner County. Kasey King ("Defendant K. King") (collectively "the Defendants") entered conditional guilty pleas in Davidson County to two counts of felony marijuana offenses and two counts of money-laundering offenses; and to one count of a felony firearm offense and two counts of felony marijuana offenses in Sumner County. These conditional guilty pleas were entered after the trial courts denied the Defendants' motions to suppress evidence gleaned from wiretaps on several telephones. Each of the Defendants reserved certified questions of law regarding the legality of the wiretaps and timely appealed. This Court ordered that the appeals be consolidated. We now consider the Defendants' certified questions of law and hold that the trial courts did not err in denying the Defendants' motions to suppress. Accordingly, the Defendants are entitled to no relief from their pleas of guilt. Therefore, we affirm the trial courts' judgments and the Defendants' convictions.

**Tenn. R. App. P. 3 Appeals as of Right; Judgments
of the Circuit and Criminal Courts Affirmed**

---

[1] The indictments in these cases spell the first defendant's first name "Jeffrey." It is spelled "Jeffery" elsewhere in the record.

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Kimberly S. Hodde, Nashville, Tennessee, for the appellant, Jeffrey Kristopher King.

Jeremy Parham, Nashville, Tennessee, for the appellant, Kasey Lynn King.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; William Whitesell (Rutherford County), Victor S. Johnson III (Davidson County), and L. Ray Whitley (Sumner County), District Attorneys General; and John C. Zimmermann, Senior Assistant District Attorney General; for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On October 7, 2008, Phillip L. Taylor, state investigator for the 20th Judicial District Drug Task Force of Nashville, Davidson County, Tennessee, filed in the Criminal Court for Davidson County, Tennessee, an Application for Interception of Wire and Electronic Communications for the interception of communications through telephone line (615) 517-7591 "used by Bruce Dady" ("the First Dady Application" and "the First Dady Number"). The First Dady Application is 59 pages long and consists of 271 numbered paragraphs containing the sworn averments of Officer Taylor. The identified "concern" of the First Dady Application was "the delivery, sale, or possession with intent to sell or deliver, 700 pounds or more of any substance containing marijuana, and conspiracy to commit the same" ("the Target Crimes"). The First Dady Application identified the following individuals as participants in the Target Crimes: Vernon E. Lockhart, Bruce A. Dady, the Defendants, Michael R. Hutchison, Matthew E. Hutchison, Brandon C. Barnes, James H. Barnes, Tony Q. Ferrer, Donald W. Ellis, Cheyenne D. Davis, Kelvin S. Lockhart, and Talva Antoinnette Lockhart (collectively, "the Target Subjects"). Officer Taylor averred in the First Dady Application that the targeted phone number was "subscribed to by Marcia Dady" but was "believed to be used primarily by Bruce Dady."

Also on October 7, 2008, Officer Taylor filed in the Criminal Court for Davidson County, Tennessee, an Application for Interception of Wire and Electronic Communications for the interception of communications through telephone line (615) 714-5541 "subscribed to by Cassie T. Roark" but "believed to be used primarily by Jeffery King" ("the King Application"). The King Application is 60 pages long, consists of 275 numbered paragraphs, and is substantially similar to the First Dady Application.

2

Also on October 7, 2008, Officer Taylor filed in the Criminal Court for Davidson County, Tennessee, an Application for Interception of Wire and Electronic Communications for the interception of communications through telephone line (615) 289-5116 "subscribed to by Julie Draper" but "believed to be used by Vernon Lockhart" ("the Lockhart Application"). The Lockhart Application is 61 pages long, consists of 280 numbered paragraphs, and is substantially similar to the First Dady Application and the King Application.

On October 7, 2008, the Criminal Court for Davidson County, the Hon. Mark Fishburn ("the Issuing Court"), granted the First Dady Application, the King Application, and the Lockhart Application and issued as to each Application an Order Authorizing the Interception of Wire and Electronic Communications, a ten-page document. Each Order contains the following findings:

> 4. There is probable cause to believe that [the Target Subjects] have committed, and will continue to commit, the offenses of delivery, sale, or possession with intent to sell or deliver, 700 pounds or more of any substance containing marijuana, and conspiracy to commit same.

> [As to the First Dady Application:] 5. There is probable cause to believe that the telephone assigned phone number (615) 517-7591, a telephone service provided by Verizon Wireless, . . . subscribed to by Marcia Dady, 342 Forrest Valley Drive, Nashville, Tennessee, believed to be used by Bruce Dady, Target Subject, in connection with the commission of the above described offense [sic].

> [As to the King Application:] 5. There is probable cause to believe that the telephone assigned phone number (615) 714-5541, a telephone service provided by Verizon Wireless, . . . subscribed to by Cassie T. Roark at 1636 Stokley Lane, Old Hickory, Tennessee, believed to be used by Jeffery King, Target Subject, in connection with the commission of the above described offense [sic].

> [As to the Lockhart Application:] 5. There is probable cause to believe that the telephone assigned phone number (615) 289-5116, a telephone service provided by Verizon Wireless, . . . subscribed to by Julie Draper, 5225 Rustic Way, Old Hickory, Tennessee, believed to be used by Vernon Lockhart, Target

3

Subject, in connection with the commission of the above described offense [sic].[2]

    6.  There is probable cause to believe that the communications to be intercepted will concern the telephone numbers associated with the Target Subjects, and the dates, times, and places for commission of the aforementioned offense when the Target Subjects communicate with their co-conspirators, associates and other participants in the conspiracy, thereby identifying the co-conspirators and others as yet unknown.  In addition, these communications are expected to constitute admissible evidence of the above described offense.

    7.  It has been established adequately that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

On October 10, 2008, Officer Taylor filed with the Issuing Court an Application for Interception of Wire and Electronic Communications for the interception of wire communications through telephone line (615) 584-6075 "used by Bruce Dady" ("the Second Dady Application") (collectively with the three applications filed on October 7, 2008, "the Initial Applications").  The Second Dady Application was in large part duplicative of the First Dady Application but provided that the telephone was "subscribed to by Terry Frazier, 1455 Dickerson Bay Drive, Gallatin, Tennessee, believed to be used by Bruce Dady."

On October 10, 2008, the Issuing Court entered an Order Authorizing the Interception of Wire and Electronic Communications on the Second Dady Application.  The Order includes the following findings:

    4.  There is probable cause to believe that [the Target Subjects] have committed, and will continue to commit the offenses of delivery, sale, or possession with intent to sell or deliver, 700 pounds or more of any substance containing marijuana, and conspiracy to commit same.

    5.  There is probable cause to believe that the telephone assigned phone number (615) 584-6075, a telephone service provided by A T & T Wireless Services, . . . subscribed to by Terry Frazier, 1455 Dickerson Bay Drive,

---

[2] We note that the Orders do not contain a verb signifying the relationship between the referenced telephone and the "connection with the commission of" the offense.

4

Gallatin, Tennessee, believed to be used by Bruce Dady, Target Subject, in connection with the commission of the above described offense [sic].

6. There is probable cause to believe that the communications to be intercepted will concern the telephone numbers associated with the Target Subjects, and the dates, times and places for commission of the aforementioned offense when the Target Subjects communicate with their co-conspirators, associates and other participants in the conspiracy, thereby identifying the co-conspirators and others as yet unknown. In addition, these communications are expected to constitute admissible evidence of the above described offense.

7. It has been established adequately that normal investigative procedures have been tried and failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ.

Applications for additional wiretaps and for extensions of the wiretaps previously authorized ensued over the period from October 10, 2008 through late March 2009. The Issuing Court granted all of the State's applications, resulting in the electronic surveillance of a total of twenty-three telephones. The involved phone numbers were monitored for several months for evidence related to the Target Crimes.

In 2009, the Defendants were indicted in several Middle Tennessee counties on multiple charges including drug and money-laundering offenses.[3] In the Sumner County and Davidson County cases, the Defendants each filed a motion to suppress the evidence gleaned from the wiretaps. Defendant J. King also filed a motion to suppress the evidence gleaned from the wiretaps in the Rutherford County case. Each of the trial courts held an evidentiary hearing and subsequently issued orders denying the Defendants' motions.

Thereafter, Defendant J. King entered conditional guilty pleas in Rutherford, Davidson, and Sumner Counties, as follows:

**Rutherford County**: One count of conspiracy to sell over seventy pounds of marijuana, a Class B felony, with a sentence of twenty years in the Tennessee Department of Correction ("TDOC"), and one count of possession with intent

---

[3] In its order denying the Defendants' motions to suppress, the Sumner County trial court noted that the results of the investigation resulted in the arrest of thirty-nine defendants in five Middle Tennessee counties.

to sell or deliver over seventy pounds of marijuana, a Class B felony, with a consecutive sentence of twenty years' incarceration.[4]

**Davidson County**: One count of conspiracy to sell over three hundred pounds of marijuana, a Class A felony, with a sentence of forty years in the TDOC; two counts of conspiracy to commit money-laundering, a Class B felony, with each count carrying a concurrent sentence of twenty years' incarceration; two counts of money-laundering, Class B felonies, with each count carrying a concurrent sentence of twenty-years' incarceration; one count of the delivery of over seventy pounds of marijuana, a Class B felony, with a concurrent sentence of twenty years' incarceration; one count of the delivery of over ten pounds of marijuana, a Class D felony, with a concurrent sentence of eight years' incarceration; one count of the possession with intent to sell over ten pounds of marijuana, a Class D felony, with a concurrent sentence of eight years' incarceration; and one count of possession with intent to sell over three hundred pounds of marijuana, a Class A felony, with a concurrent sentence of forty years' incarceration.[5]

**Sumner County**: One count of conspiracy to possess over seventy pounds of marijuana, a Class B felony, with a sentence of twenty years in the TDOC; three counts of the delivery of over ten pounds of marijuana, a Class D felony, with concurrent sentences of six years' incarceration for each offense; one count of the possession of over seventy pounds of marijuana, a Class B felony, with a consecutive sentence of twenty years in the TDOC; one count of possessing a firearm during the commission of a felony, a Class E felony, with a concurrent sentence of two years' incarceration; and seven counts of money-laundering, a Class B felony, each with a concurrent sentence of twenty years' incarceration.[6]

Defendant K. King entered conditional guilty pleas to the following offenses:

**Davidson County**: One count of conspiracy to sell over three hundred pounds of marijuana, a Class A felony, with a sentence of fifteen years in the TDOC; one count of the delivery of over seventy pounds of marijuana, a Class B

---

[4] Defendant J. King was sentenced as a Range II offender for these offenses.

[5] Defendant J. King was sentenced as a Range II offender for these offenses.

[6] Defendant J. King was sentenced as a Range II offender for these offenses.

6

felony, with a concurrent sentence of twelve years' incarceration; and two counts of money laundering, a Class B felony, each with a concurrent sentence of twelve years' incarceration.[7]

**Sumner County**:  One count of conspiracy to possess over seventy pounds of marijuana, a Class B felony, with a sentence of twelve years in the TDOC; one count of possessing a firearm during the commission of a felony, a Class E felony, with a consecutive sentence of one year in the TDOC; and one count of possessing over one-half ounce of marijuana for resale, with a consecutive sentence of two years in the TDOC.[8]

In conjunction with each plea, the Defendants each reserved the following certified questions of law:[9]

In the trial court, the Defendant moved to suppress the fruits of electronic surveillance on numerous grounds:  (1) that the initial wiretap Applications lacked probable cause to justify interception in violation of T.C.A. §§ 40-6-304(c) and 40-6-305, specifically including the Applications' failure to demonstrate the statutorily required nexus between the phone to be intercepted and the alleged illegal activity sought to be intercepted; (2) that the initial Applications failed to demonstrate a constitutionally sufficient requisite necessity for the use of electronic surveillance pursuant to T.C.A. § 40-6-304(a)(3) and 18 U.S.C. § 2518(1)(c); (3) that all subsequent wiretaps were the fruits of the prior illegal wiretap interceptions and therefore, were fruits of the poisonous tree; (4) that the notarized but unsigned affidavit requesting a second extension of the wiretap for telephone number (615) 584-6075 was statutorily deficient to support interception; (5) that, in addition to being a fruit of the prior illegal interceptions, the subsequent interception of telephone (615) 653-2294 lacked probable cause to justify interception in violation of T.C.A. §§ 40-6-304(c) and 40-6-305 because they [sic] failed to make a sufficient link between the phone and suspected criminal activity or the targets of the investigation; (6) that, in addition to being a fruit of the prior illegal interceptions, the subsequent interception of telephone (615) 818-2839 lacked probable cause to justify interception in violation of T.C.A.  §§ 40-6-304(c)

---

[7] Defendant K. King was sentenced as a Range I offender for these offenses.

[8] Defendant K. King was sentenced as a Range I offender for these offenses.

[9] See Tenn. R. Crim. P. 37(b)(2).

7

and 40-6-305 because they [sic] failed to make a sufficient link between the phone and suspected criminal activity or the targets of the investigation; (7) that the Applications for extensions of the wiretaps failed to articulate a statutorily sanctioned purpose justifying continuing interception; (8) that the issuing Court neglected its duty as a neutral and detached magistrate and acted as an impermissible rubber stamp for law enforcement; and, (9) that the Applications contain omissions and material misstatements that undercut any showing of requisite necessity for the wiretaps.

The Defendants timely appealed from their convictions,[10] and this Court ordered that the appeals from the judgments of conviction entered in the Rutherford County, Davidson County, and Sumner County prosecutions be consolidated. We now consider the certified questions of law reserved by the Defendants relating to the legality of the wiretaps, and the trial courts' denial of their motions to suppress.

**Standard of Review**

We will uphold a trial court's findings of fact at a suppression hearing unless the evidence preponderates to the contrary. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Id. "We afford to the party prevailing in the trial court the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). We review, however, a trial court's application of the law to the facts under a de novo standard of review. State v. Williams, 185 S.W.3d 311, 315 (Tenn. 2006).

In the context of these cases, in which we are reviewing the trial courts' review of the Issuing Court's orders permitting the wiretaps, we must decide whether the trial courts erred in concluding that the Issuing Court had a "substantial basis" for finding probable cause. See State v. Moore, 309 S.W.3d 512, 523 (Tenn. Crim. App. 2009), perm. app. denied (Tenn. Feb. 22, 2010); see also Massachusetts v. Upton, 466 U.S. 727, 732-33 (1984) (holding that a reviewing court is not to conduct "a *de novo* probable-cause determination" but instead merely is to decide "whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause"). "A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an

_____

[10] As the State points out in its brief, Defendant J. King filed his notice of appeal from the judgments of the Rutherford County trial court two days late. We have nevertheless chosen to consider Defendant J. King's appeal from his Rutherford County judgments of conviction. See Tenn. R. App. P. 4(a).

illegal act." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999).  Moreover, "'in passing on the validity of a warrant, the reviewing court may consider only the information brought to the magistrate's attention.'" Moore, 309 S.W.3d at 523 (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989)).  "'In reviewing the validity of an electronic surveillance order, we will accord "great deference" to the determination of the issuing judge.'" Id. (quoting United States v. Corrado, 227 F.3d 528, 539 (6th Cir. 2000)).  "'[T]he fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant.'" Corrado, 227 F.3d at 539 (quoting United States v. Alfano, 838 F.2d 158, 162 (6th Cir. 1988)).

**Analysis**

*Tennessee Code Annotated Section 40-6-304*

To assist in our resolution of this matter, we deem it helpful first to review the statutory basis for the electronic surveillance that was conducted in these cases.

Tennessee Code Annotated section 40-6-304 provides, in pertinent part, as follows:

> (a) Each application for an order authorizing the interception of a wire, oral or electronic communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction in the district where the interception of a wire, oral or electronic communication is to occur, or in any district where jurisdiction exists to prosecute the underlying offense to support an intercept order under § 40-6-305.  The application shall state the investigative or law enforcement officer's authority to make the application and shall include the following information:

> (1) Identity of the investigative or law enforcement officer making the application, and the district attorney general authorizing the application;

> (2) A full and complete statement of the facts and circumstances relied upon by the applicant to justify the applicant's belief that an order should be issued, including:

> (A) Details as to the particular offense that has been, is being, or is about to be committed;

9

(B) A particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted;

(C) A particular description of the type of communications sought to be intercepted; and

(D) The identity of all persons, if known, committing the offense and whose communications are to be or may be intercepted;

(3) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

. . . .

(c) Upon an application the judge may enter an ex parte order, as requested or as modified, authorizing interception of wire, oral or electronic communications within the district in which the judge is sitting, and outside that district but within the state of Tennessee in the case of a mobile interception device, if the judge determines on the basis of the facts submitted by the applicant that:

(1) There is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in § 40-6-305;[11]

(2) There is probable cause for belief that particular communications concerning that offense will be obtained through the interception;

(3) Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; and

(4) There is probable cause for belief that the facilities from which, or the place where, the wire, oral or electronic communications are to be

---

[11] Tennessee Code Annotated section 40-6-305 includes "[t]he commission of a violation of § 39-17-417(j)." Tenn. Code Ann. § 40-6-305(3) (2006). Tennessee Code Annotated section 39-17-417(j), which was in effect at the time of the relevant offense, includes the sale, delivery, and possession with intent to sell or deliver at least 700 pounds of marijuana, and conspiracy to commit same. Id. § 39-17-417(j)(13)(B) (Supp. 2008).

intercepted are being used, or about to be used, in connection with the commission of the offense, or are leased to, listed in the name of, or commonly used by the person.[12]

(d)(1) Each order authorizing the interception of any wire, oral or electronic communication under this part . . . shall specify:

(A) The identity of all persons, if known, whose communications are to be or may be intercepted;

(B) The nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

(C) A particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

(D) The identity of the agency authorized to intercept the communications, and the identity of the person authorizing the application; and

(E) The period of time during which the interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained.

. . . .

(e) No order entered under this section may authorize or approve the interception of any wire, oral or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty (30) days. . . . Extensions of an order may be granted, but only upon application for an extension make in accordance with subsection (a) and the court making the findings required by subsection (c).

Tenn. Code Ann. § 40-6-304 (2006) ("the Wiretap Statute"). Our research reveals only a few decisions from Tennessee's appellate courts construing this statute. However, because the

---

[12] "[T]he person" is the "individual" referred to in subpart (1) who "is committing, has committed, or is about to commit a particular offense enumerated in § 40-6-305." See United States v. Dadanovic, Criminal No. 09-63-ART, 2010 WL 3620251, at *9 (E.D. Ky. Sept. 10, 2010). In each of the Initial Applications, the identified Target Subjects included the individual believed to be using the phone sought to be intercepted, i.e., Dady, King, and Lockhart.

11

Wiretap Statute is virtually identical to its federal counterpart,[13] codified at 18 United States Code section 2518, the decisions of federal courts offer significant guidance. See Moore, 309 S.W.3d at 525; see also State v. Munn, 56 S.W.3d 486, 497 (Tenn. 2001).

We turn now to our analysis of the certified questions of law presented in these consolidated appeals.

*Nexus*

The Defendants contend that the Initial Applications did not establish probable cause to believe that the telephones sought to be tapped were "being used, or [were] about to be used, in connection with the commission of" the Target Crimes. Tenn. Code Ann. § 40-6-304(c)(4).[14] Accordingly, they argue, the Issuing Court erred in ordering the wiretaps, and the trial courts erred in denying the Defendants' motions to suppress. The State disagrees.

The Rutherford County trial court found that "the relevant wiretap applications contained sufficient information to support Judge Fishburn's finding of probable cause that targets were committing, had committed, or were about to commit a crime included in Tenn. Code Ann. § 39-17-417(j)(13)" and that the Issuing Court "had a substantial basis to believe that [Defendant J. King] was using these phones [sic] in furtherance of his criminal operation."

---

[13] See Frierson v. Goetz, 99 Fed. Appx. 649, 652 (6th Cir. 2004) ("The Tennessee Wiretap Law, Tenn. Code Ann. §§ 40-6-301 et seq., parallels the Federal Wiretap Law in prohibiting the unauthorized interception and disclosure of oral communications and in requiring certain procedures to obtain an order."); United States v. Kelley, 596 F.Supp.2d 1132, 1137, 1141 (E.D. Tenn. 2009) (recognizing that the Tennessee and federal wiretap statutes are "identical").

[14] Although the first of the Defendants' certified questions refers specifically only to "the statutorily required nexus between the phone to be intercepted and the alleged illegal activity sought to be intercepted," the Defendants clarify in their reply brief that the "heart" of their probable cause challenge is that "[t]he State never conducted consensually monitored and recorded calls to any of the target telephones to discuss any target offense or criminal conduct." That is, the Defendants contend that the State failed to satisfy the nexus requirement set forth in subsection (c)(4) of the Wiretap Statute, which requires probable cause to believe that the targeted telephone is "being used, or [is] about to be used, in connection with the commission of the offense." Tenn. Code Ann. § 40-6-304(c)(4). As our supreme court has emphasized, "[n]o issue beyond the scope of the certified question will be considered." State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988); see also State v. Day, 263 S.W.3d 891, 899-900 (Tenn. 2008) (limiting its consideration to the "narrow issue" presented explicitly in the certified question and emphasizing "[o]nce again . . . the importance of clearly identifying the scope and limits of an issue intended to be preserved by a certified question"). Therefore, we decline to address any potential contention that there was no "probable cause for belief that particular communications concerning [the] offense will be obtained through the interception." Tenn. Code Ann. § 40-6-304(c)(2).

12

The Sumner County trial court rejected the Defendants' argument that subsection (c)(4) required probable cause to believe that the targeted telephone number was being used to commit the Target Crimes and, instead, focused on the alternative probable cause requirement, that there be probable cause to believe that the targeted telephone number was "leased to, listed in the name of, or commonly used by" the targeted person. Tenn. Code Ann. § 40-6-304(c)(4). Cf. United States v. Dadanovic, Criminal No. 09-63-ART, 2010 WL 3620251, at *9 (E.D. Ky. Sept. 10, 2010) (recognizing that the federal counterpart to this provision "is satisfied *either* if 1) the phone is being used by someone in connection with the offense *or* 2) it is commonly used by an individual who 'is committing, has committed, or is about to commit a particular offense'") (citing 18 U.S.C. § 2518(3)(d)) (emphases added). The Sumner County trial court ruled that "[t]he Applications clearly show that the original Application's phones were listed in the name of the Targets' wives, and the Pen Registers showed that these phones were being used by the targets in communication with the other conspirators."

The Davidson County trial court, like the Rutherford County trial court, ruled that the Applications sufficiently established probable cause to believe that the targeted telephones were being used to commit the Target Crimes:

> The information in the Applications provided the issuing judge a substantial basis to find probable cause that interception of the target phones would provide evidence of the conspiracy. As [indicated by pen register statistics], target suspects made a high volume of calls to other suspected co-conspirators between the July-September 2008 time period [covered by the pen register]. For example: the Application for Lockhart's telephone cited that there were 401 calls between Lockhart and Jeffrey King and 480 calls between Lockhart and [Cheyenne] Davis within the three-month period; the Application for Jeffrey King's phone cited 336 calls between Jeffrey King and Kasey King and 178 calls between Jeffrey King and Dady for that same period. . . . The Sixth Circuit, among other federal courts, has concluded that where "there is a recurring pattern of multiple connections among the phone calls, between and among recognized members of the conspiracy . . . [it] adds to the evidence amounting to 'a fair probability' that interception of further calls would reveal evidence of a crime." United States v. Alfano, 838 F.2d 158, 162 (6th Cir. 1988) (reversed District Court's decision granting suppression motion), cert. denied 109 U.S. 65.

> Accordingly, the Court finds that each [of] the initial four applications speak for themselves and the four corners of the initial four applications provide probable cause for the interception.

13

As the Defendants apparently do, we construe the Davidson County trial court's finding that the Initial Applications were sufficient on which to "find probable cause that interception of the target phones would provide evidence of the conspiracy," the probable cause requirement set forth in (c)(2), as including a finding that the target phones were being used to commit the conspiracy, one of the probable cause requirements set forth in (c)(4).

The Defendants contend that the Davidson County trial court misconstrued Alfano and that the Initial Applications do not establish probable cause to believe that the targeted telephones were being used to commit the Target Crimes. We deem it unnecessary to address this issue, however, because we agree with the Sumner County trial court that the Initial Applications established probable cause to believe that each of the targeted telephones was "leased to, listed in the name of, or commonly used by the person" targeted, i.e. Bruce Dady, Defendant J. King, or Vernon Lockhart, respectively.

The Defendants also attack the Sumner County trial court's conclusion, asserting that it "did not cite any federal case law on the nexus issue in determining this matter of first impression" and that the trial court's "interpretation of the probable cause telephone nexus requirement (or lack thereof) is patently incorrect and must be reversed." It appears from our review, however, that the Sumner County trial court did not cite any federal case law because, as pointed out by the Defendants, the United States Department of Justice has set forth in its United States Attorneys' Manual the following policy regarding affidavits in support of applications in federal court for electronic surveillance:

> [The affidavit] must establish probable cause that the named subjects are using the targeted facility[15] or location to commit the stated offenses. Any background information needed to understand fully the instant investigation should be set forth briefly at the beginning of this section. The focus, however, should be on recent and current criminal activity by the subjects, with an emphasis on their use of the target facility or location. This is generally accomplished through information from a confidential informant, cooperating witness, or undercover agent, combined with pen register or telephone toll information for the target phone or physical surveillance of the target premises. Criminal Division policy requires that the affidavit demonstrate criminal use of the target facility or premises within six months from the date of Department approval. For wire communications, where probable cause is demonstrated by consensually recorded calls or calls

---

[15] The "facility" in this context is the telephone sought to be monitored. See James G. Carr & Patricia L. Bellia, Law of Electronic Surveillance § 4:25 (Feb. 2013) (citing United States v. Tavarez, 40 F.3d 1136, 1139 (10th Cir. 1994) (construing Oklahoma statute)).

intercepted over another wiretap, the affidavit should include some direct quotes of the calls, with appropriate characterization. Criminal Division policy dictates that . . . pen register or telephone toll information for the target telephone, or physical surveillance of the targeted premises, standing alone, is generally insufficient to establish probable cause.  Generally, probable cause to establish criminal use of the facilities or premises requires independent evidence of use of the facilities or premises in addition to pen register or surveillance information, often in the form of informant or undercover information.   It is preferable that all informants used in the affidavit to establish probable cause be qualified according to the "Aguilar-Spinelli" standards (Aguilar v. Texas, 378 U.S. 108 (1964) and Spinelli v. United States, 393 U.S. 410 (1969)), rather than those set forth in the Supreme Court decision of Illinois v. Gates, 463 U.S. 1237 (1983).   Under some circumstances, criminal use of the target facility within six months of Department approval may be established in the absence of consensually recorded communications or prior interceptions when use of the phone may be tied to a significant event, such as a narcotics transaction or a seizure, through phone records.  In addition to criminal use within six months, the affidavit must also show recent use of the facility or premises within 21 days from the date on which the Department authorizes the filing of the application.   For wire and electronic communications, the affidavit must contain records showing contact between the facility and at least one other criminally relevant facility that demonstrates necessity for the wiretap within 21 days of Department approval. The affidavit must clearly and specifically demonstrate how the other facility is criminally relevant and state the date range for the contacts and the date of the most recent contact.  The date range for all pen register/phone records data must be updated to within 10 days of submission to OEO.  For extension requests, the affidavit should include some direct quotes of wire communications (and/or electronic communications, if applicable), with appropriate characterization, including one from within seven days of Department approval, or an explanation of the failure to obtain such results and the continued need to conduct interceptions. . . . (updated October 2012).

http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00029.htm (last viewed on July 19, 2013) (footnote added). See also David Kris & Douglas Wilson, National Security Investigations and Prosecutions, § 11.6 n.17 (Database updated June 2013) (noting that, "[a]s the government explained in its supplemental brief to the Foreign Intelligence Surveillance Court of Review in 2002, '[f]or prudential reasons, the Department in practice is often cautious about using the "listed, leased, or commonly used" provision of [the federal

15

wiretap statute] absent evidence that the facility is in fact being used in connection with the predicate offense.'") (citation omitted).

Given the Department of Justice's policy, it is no surprise that the Sumner County trial court did not cite any federal case law in support of its conclusion that probable cause had been established on the alternative ground that the targeted telephone had been commonly used by the targeted person (Dady, King or Lockhart). It appears that, although the federal wiretapping statute contains the same alternative ground as appears in Tennessee's statute, see 18 U.S.C. § 2518(3)(d), the Department of Justice has made a policy decision to not rely on that ground. Therefore, apparently, the federal courts have not had occasion to consider this alternative ground. But see Dadanovic, supra. Our research has revealed no federal decisions holding that the alternative ground of "leased to, listed in the name of, or commonly used by the person" is not adequate to support issuance of a surveillance order. Nor have the Defendants cited us to any such cases.

The Department of Justice's policy is not binding on this Court's interpretation of Tennessee legislation. The Tennessee Supreme Court instructs us that we "have a duty to 'construe a statute so that no part will be inoperative.'" In re Sidney J., 313 S.W.3d 772, 775-76 (Tenn. 2010) (quoting Tidwell v. Collins, 522 S.W.2d 674, 676 (Tenn. 1975)). Were we to require, as the Defendants insist, that every application for a wiretap include information establishing probable cause to believe that the telephone was being used, or was about to be used, in connection with the commission of the relevant offense, we would be rendering the alternative ground superfluous. This we decline to do. Accordingly, we turn to each of the Initial Applications to consider whether there was a substantial basis for the Issuing Court to find probable cause that the targeted phone number was "leased to, listed in the name of, or commonly used by the person" targeted.

### The First Dady Application

With regard to Dady, Officer Taylor averred in the First Dady Application that he believed phone number (615) 517-7591 was "subscribed to by Marcia Dady, 342 Forrest Valley Drive, Nashville, Tennessee," but was "used primarily by Bruce Dady," who was indicated as having the same address as Marcia Dady. While we disagree with the Sumner County trial court that the First Dady Application provided that Marcia Dady was Dady's wife, her status as his spouse was not necessary for the Issuing Court to conclude that there was a substantial basis for finding probable cause to believe that Dady "commonly used" the telephone. While the specific relationship between Marcia Dady and Bruce Dady is unclear, the First Dady Application indicated clearly that both individuals resided at the same address.

16

The First Dady Application also averred that Dady received a sentence in federal court in 2001 after pleading guilty "to his participation in a drug organization distributing multiple kilograms of cocaine." Additionally, the First Dady Application reflected that a confidential source identified as "CS-6" was personally acquainted with Dady and Matthew Hutchison, a person identified in the First Dady Application as a participant in the Target Crimes. CS-6 learned through this acquaintance "that Dady gets large quantities of marijuana from either, Jeffery King, Kasey King, or Vernon Lockhart, depending on who has marijuana to sell." Moreover, "around Memorial Day weekend (2008)," CS-6 "overheard Dady joking with Hutchison that Hutchison sold 36 pounds of marijuana that day." CS-6 also reported having purchased marijuana from Hutchison before and that, while Dady was present, CS-6 paid Hutchison and Hutchison paid Dady.

In addition to this information about Dady's drug-dealing activities, the pen register statistics gathered on the First Dady Number during the period July 17, 2008, through September 25, 2008, and set forth in the First Dady Application, indicated that there were 221 calls to/from number 712-0267 subscribed to and used by Michael Hutchison, another person identified in the First Dady Application as a person involved in the Target Crimes; 94 calls to/from number 485-8534 subscribed to and used by Matthew Hutchison; 11 calls to/from number 859-6426 subscribed to by Ashley Garris and used by Defendant K. King "(home no.)"; 182 calls to/from number 714-5541 subscribed to by Cassie Roark and used by Defendant J. King; and 88 calls to/from number 478-8355 subscribed to by Ashley Garris and used by Defendant K. King, "cell." This pen register information established that the phone subscribed to by Marcia Dady was used to make almost 600 phone calls over the course of approximately ten weeks to other persons suspected of participating in the Target Crimes, including 94 calls to the phone number subscribed to and used by Matthew Hutchison. As set forth above, the First Dady Application included averments that Dady was involved in drug-trafficking with Matthew Hutchison. Marcia Dady was not listed in any of the Initial Applications as a person suspected of participating in the Target Crimes.

On the basis of these averments contained in the First Dady Application, we hold that the First Dady Application set forth a substantial basis from which the Issuing Court could find probable cause to believe that Dady was the person making these telephone calls, not Marcia Dady. Accordingly, we hold that the First Dady Application established probable

cause to believe that Dady "commonly used" the intercepted telephone.[16]  Thus, the Defendants are entitled to no relief on this issue.

## The King Application

The King Application targeted telephone number (615) 714-5541, averred to be subscribed to by Cassie T. Roark but used primarily by Defendant J. King.  The King Application also averred that a confidential source "learned that Jeffery King had purchased a beauty shop in downtown Nashville for his wife" and that,

> [a]ccording to the records of the County Clerk for Metropolitan Nashville Davidson County, a March 8, 2005 business license for Eye Candy at 1201 Villa Place Suite 103, lists the owners of Eye Candy, a beauty shop business, as Cassie Roark and Judy Randall.  On February 19, 2004, Cassie T. Roark at 1636 Stokley Lane, Old Hickory, Tennessee (Jeffery King's home address) registered a 2002 Cadillac Escalade in her name.  According to the records of the Tennessee Department of Safety, Cassie T. King with an address of 1636 Stokley Lane, Old Hickory, Tennessee holds Tennessee driver license number 081875821.  From this, I believe Cassie Roark is Jeffery King's wife, Cassie T. King.  This corroborates CS-4's statement about Jeffery King purchasing his wife a beauty shop in Nashville.

In addition to this information, the King Application averred that an investigator with the 18th Judicial District Drug Task Force had purchased approximately 2,860 pounds of marijuana from a confidential source identified as "CS-3."  CS-3 reported that his supplier was David Hooks and that Hooks obtained the marijuana from Brandon Barnes, a person identified in the King Application as involved in the Target Crimes. Another confidential informant identified as "CS-5" "contacted law enforcement because CS-5 believed that Jeffery King was going to murder CS-5."  CS-5 reported that an acquaintance had stolen marijuana from Donald Ellis' home.  Donald Ellis was also identified as a person involved in the Target Crimes.  According to CS-5, Ellis stored marijuana "for Jeffery King and his organization."  CS-5 knew both Ellis and Defendant J. King. Ellis told CS-5 that he was paid seven dollars per pound for storing marijuana for Defendant J. King.  Defendant J. King blamed CS-5 for the theft.  CS-5 told investigators that Ellis' phone number was 330-4961.

---

[16] We recognize that the Issuing Court did not make a specific finding that Dady "commonly used" the telephone associated with the First Dady Number.  We, nevertheless, may uphold the validity of the Order granting the wiretap on this alternative basis for a finding of probable cause. See, e.g., State v. Stevens, 989 S.W.2d 290, 295 (Tenn. 1999) (although trial court granted search warrant based on erroneous probable cause analysis, alternative grounds of probable cause were sufficient to support warrant).

Additional investigation revealed that Ellis was the subscriber for phone number 330-4961. Another confidential informant identified as CS-6 told an investigator

> that on June 18, 2008, CS-6 talked to Matthew Hutchison. CS-6 said Hutchison said a shipment was expected to arrive and he (Hutchison) and Bruce Dady were waiting to hear from "the brothers." CS-6 understood this to be a reference to Jeffery King and Kasey King. CS-6 gave Investigator Hardin the telephone number 485-8534 as a contact number for Matthew Hutchison.

The King Application also indicated that Defendant J. King and Lockhart were stopped by Immigration and Customs Enforcement agents in North Carolina as they re-entered the United States from the Bahamas. "Lockhart and King told the agents they had been to the Bahamas to purchase property."

Finally, pen register statistics collected during the period July 17, 2008, through September 25, 2008, and included in the King Application, reflected that the targeted telephone was used in 417 calls to/from number 289-5116 subscribed to by Julie Draper and used by Vernon Lockhart; 300 calls to/from number 478-8355 subscribed to by Ashley Garris and used by Defendant K. King; 178 calls to/from number 517-7591 subscribed to by Marcia Dady and used by Bruce Dady; 114 calls to/from number 887-3801 subscribed to and used by Brandon Barnes; 14 calls to/from number 294-1455 subscribed to and used by Cheyenne Davis, another person identified as involved in the Target Crimes; 14 calls to/from number 330-4961 subscribed to and used by Donald Ellis; 53 calls to/from number 364-6708 subscribed to and used by Jason Walker, another person identified as involved in the Target Crimes; 36 calls to/from number 859-6426 subscribed to by Ashley Garris and used by Defendant K. King "(home no.)"; 14 calls to/from "2 Bahamas numbers"; and 1 call to/from number 011-52-165-62763720 "Mexico telephone." Thus, the targeted phone was used to make many calls to/from persons identified as participants with Defendant J. King in drug dealing.

We agree with the Sumner County trial court that the King Application provided sufficient information from which to draw the conclusion that the targeted phone number was subscribed to by Defendant J. King's wife, Cassie Roark or Cassie King. We also hold that the King Application set forth a substantial basis from which the Issuing Court could find probable cause to believe that Defendant J. King was the person making these telephone calls, not his wife. Accordingly, we hold that the King Application established probable cause to believe that Defendant J. King "commonly used" the targeted telephone and that the Defendants are entitled to no relief on this basis.

19

## The Lockhart Application

The Lockhart Application averred that the targeted telephone was subscribed to by Julie Draper, whose address was listed as 5225 Rustic Way, Old Hickory, Tennessee. The Lockhart Application further averred that records at the Tennessee Secretary of State's office indicated that Lockhart signed the incorporation documents for VEL Properties, located at 5225 Rustic Way, Old Hickory, Tennessee (the subscriber Julie Draper's address) and that Lockhart also signed the incorporation documents for VEL Trucking and Excavation, also located at 5225 Rustic Way, Old Hickory, Tennessee. The Lockhart Application further averred that Lockhart provided the targeted telephone number as his work number to Tucson Electric and Power. Finally, pen register statistics collected on the targeted telephone during the period July 17, 2008, through September 25, 2008, indicated that the targeted telephone was used in 480 calls to/from number 294-1455 subscribed to and used by Cheyenne Davis; 401 calls to/from number 714-5541 subscribed to by Cassie Roark and used by Defendant J. King; 38 calls to/from number 517-7591 subscribed to by Marcia Dady and used by Bruce Dady; 3 calls to/from number 887-3801 subscribed to and used by Brandon Barnes; and 61 calls to/from "16 Bahamas numbers."

This information, particularly Lockhart's reference to the targeted telephone as his work number, provided the Issuing Court with a substantial basis from which to find probable cause to believe that Lockhart "commonly used" the targeted telephone. Accordingly, the Defendants are entitled to no relief on this issue.

## The Second Dady Application

In the Second Dady Application, which sought a wiretap of phone number (615) 584-6075, Officer Taylor averred the following:

21. The court ordered wiretap of [the First Dady Number] was activated on October 9, 2008. At 3:25 p.m. Dady called Verizon Wireless and had the service for that telephone terminated immediately. He told the Verizon Wireless customer service representative that he had other telephones and no longer needed this telephone.

22. The court ordered interception of Jeffery King's telephone was also activated on October 9, 2008. At 11:24 a.m. an outgoing call was intercepted from the Target Telephone, 584-6075. The call was between Bruce Dady using the Target Telephone and Jeffery King. The conversation was small talk unrelated to drugs.

20

23. At 1:57 p.m. on October 10, 2008, an incoming call was intercepted on Jeffery King's telephone, from 584-6075. The call was from Bruce Dady. Dady was asking to borrow a $1,000 from King to put down on a piece of real estate.

24. At 7:48 p.m. on October 10, 2008, an incoming call was intercepted on Jeffery King's telephone, from 584-6075. The call was between Dady and King. They discussed King's pending divorce.

25. Based on the above facts and circumstances, I believe that Dady has begun using the 584-6075 telephone as a replacement for the terminated 517-7591 telephone. Investigators anticipate that Dady's use of 584-6075 will have the same call pattern as that presented in the Application for the interception of 517-7591, which is incorporated by reference in this Application.

Thus, the Second Dady Application included specific instances of Dady using the targeted phone. We hold that the Second Dady Application provided the Issuing Court with a substantial basis from which to find probable cause to believe that Dady "commonly used" the targeted telephone. The Defendants are entitled to no relief on this basis.[17]

In sum, the Defendants are entitled to no relief on the basis of their first certified question.

*Requisite Necessity*

The Defendants next contend that the Initial Applications "failed to demonstrate a constitutionally sufficient requisite necessity for the use of electronic surveillance pursuant to T.C.A. § 40-6-304(a)(3)." As set forth above, the Wiretap Statute requires that an application for a wiretap include "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Tenn. Code Ann. § 40-6-304(a)(3). The Wiretap Statute also requires the issuing judge to determine that "[n]ormal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." Id. § 40-6-304(c)(3).

---

[17] As a result of this conclusion, we need not address whether the Initial Applications established probable cause to believe that the targeted phones were being used, or were about to be used, in connection with the commission of the targeted offenses.

21

As this Court previously has recognized, this provision is "'simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" Moore, 309 S.W.3d at 525 (quoting United States v. Kahn, 415 U.S. 143, 153 n.12 (1974)). Accordingly, this Court has observed that "[l]aw enforcement is not required to 'exhaust every conceivable non-wiretap investigative technique,'" and that "'[a]ll that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.'" Id. (quoting United States v. Lambert, 771 F.2d 83, 91 (6th Cir. 1985)); see also Corrado, 227 F.3d at 539 ("This court has clarified that the purpose of the necessity requirement 'is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques.'") (quoting United States v. Landmesser, 553 F.2d 17, 20 (6th Cir. 1977)). However, while a wiretap need not be used as a last resort,

> a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be . . . an inadequate compliance with the statute. . . . [Rather,] the mere fact that the affidavit . . . rested in part on statements that would be equally applicable to almost any [similar] case does not render the affidavit insufficient. What is required in addition, however, is information about particular facts of the case at hand which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation.

Moore, 309 S.W.3d at 526 (quoting Landmesser, 553 F.2d at 20) (internal quotation marks and citation omitted).

In the First Dady Application, the King Application, and the Lockhart Application, Officer Taylor set forth the following:

> []. There are multiple Target Subjects and multiple Target Telephones involved in this investigation. The focus of the investigation is not one particular Target Subject, but the prosecution and dismantling of the entire operation. Therefore, I am including the same information about attempts to use alternative investigative techniques and/or reasons why alternative investigative techniques will not work in these applications simultaneously presented to the Court. The successful investigation of one of the Target Subjects would likely not lead to the prosecution of the other conspirators/Target Subjects. Additionally, while some of the investigative

22

techniques may result in a certain amount of success on one Target, the successes may be detrimental to the focus of the operation by alerting the other conspirators/Target Subjects to the existence of this major investigation.

Officer Taylor then proceeded to explain why various forms of traditional investigative techniques would not be successful in "dismantling the entire operation."[18]

As to physical surveillance, Officer Taylor explained that this investigative technique would "only provide evidence of an apparent delivery or pickup of a shipment of drugs" and that "[e]ven under the best of circumstances, surveillance will not disclose the full extent of a drug trafficking organization." He also asserted that the "law enforcement agencies involved in this investigation have limited manpower resources" and that, even if physical surveillance "were a viable option to successfully investigate a drug trafficking operation, deciding who to watch, when to watch them, where to watch them, and how long to watch them, would be extremely difficult if not impossible." He also explained, explicitly, why the residences where nine of the targeted subjects were suspected of living would be very difficult locations at which to conduct surveillance because of the risk of discovery. Officer Taylor explained that surveillance cameras were expensive and, absent inside information, impractical and of limited benefit.

As to using confidential sources, Officer Taylor averred that his "experience [had] taught [him] that even sources close to a targeted drug trafficker do not know the full extent and details of the operation." A second problem using confidential sources, Officer Taylor explained, "is being able to communicate with the confidential source while the activities are taking place." Thus, the only information gleaned would be after-the-fact and of limited use in dismantling the entire operation. Finally, Officer Taylor explained that targets will not deal with a confidential source known by the targets to have been arrested. Officer Taylor referred to two specific incidents involving CS-3 and Paul Hamer and their interactions with Defendant J. King and target John Butler:

[]. The statements of CS-3 about running in to Jeffery King at Toys R Us and Jeffery King accused CS-3 of "ratting" on Hook, confirms my statements that a confidential source who has been arrested is not trusted by the other conspirators. In most cases they will not deal with or even talk to an associate who has been arrested.

---

[18] The Second Dady Application incorporated by reference the requisite necessity section contained in the First Dady Application.

[]. Further proof of this, is Paul Hamer's statement to investigators that approximately six months after the seizure of 800 pounds of marijuana from Hamer, he went to John Butler's home. According to Hamer, Butler refused to acknowledge Hamer was present.

Officer Taylor also explained why using confidential sources to purchase large amounts of marijuana from Dady was not feasible and would put the larger investigation at risk:

[]. As stated in the above paragraphs, CS-1 is cooperating with investigators in an effort to obtain favorable treatment on charges arising from the seizure of 724 pounds of marijuana on October 26, 2006. The seizure is unrelated to the organization that is the target of this wiretap investigation. CS-1 has recently spoken with Bruce Dady. Dady offered to sell CS-1 large quantities of marijuana. CS-1 initially declined the offer. CS-1 told investigators about the offer.

[]. CS-1 told investigators that he could purchase as much as 200 or 300 pounds of marijuana but could not purchase less than 20 pounds. After discussing the situation with other investigators, it was agreed that it would be detrimental to the investigation to arrest Dady with 200 or 300 pounds of marijuana. It is feared that the arrest of Dady would cause the other Target Subjects to change their telephone numbers and/or change the way they buy, transport, store and sell the marijuana for fear Dady would cooperate with law enforcement.

[]. The cost for 200 pounds of marijuana ($110,000 to $130,000) makes buying the marijuana, without making an arrest, financially impossible. While arresting Dady selling 200 pounds of marijuana would be significant evidence with which to prosecute Dady, there would be little or no evidence to connect any of the other Target Subjects to the seizure.

[]. CS-1 stated that he can not buy from any of the other primary Target Subjects, particularly Vernon Lockhart, Jeffery King and Kasey King.

[]. At this time, investigators intend to use CS-1 as an undercover operative after the activation of the requested wiretaps. Being able to intercept the communications of Bruce Dady while CS-1 negotiates the purchase of a quantity of marijuana, may provide investigators with valuable information

about who Dady gets the marijuana from, where the marijuana is being stored, who else is involved in facilitating the sale, and where the proceeds are taken.

[]. As stated in the probable cause section above, CS-6 made recorded calls to Matthew Hutchison in an attempt to purchase marijuana. At that time Hutchison said they were waiting to hear from "the brothers." Investigators believe that using CS-6 to make a purchase of marijuana from Hutchison will not accomplish the goals of the investigation of this marijuana distribution operation.

[]. Because of financial constraints, CS-6 will not be able to purchase more than 10 or 20 pounds of marijuana from Hutchison. As with the possibility of CS-1 purchasing marijuana from Dady, CS-6's purchase of 10 or 20 pounds of marijuana from Hutchison would not accomplish the goals of this investigation. Buying marijuana from Hutchison would not provide evidence that could be used to prosecute the other members of this organization, especially the heads of the organization, Jeffery King, Kasey King, Vernon Lockhart, and others.

Officer Taylor explained that infiltration by undercover officers encountered the same problems with the use of confidential sources and, further, was "too dangerous to employ."

As to "general questioning," Officer Taylor set forth the following:

[]. General questioning of co-conspirators and associates, without pending criminal charges, of the Target Subjects was considered but not attempted because those individuals who are knowledgeable of the subject's criminal activities are generally participants in the criminal acts and are unwilling to provide information to investigative officers. Attempts at such general questioning would likely be communicated to the Target Subjects thereby compromising the investigation and possibly resulting in destruction and concealment of documents, contraband, and other evidence.

[]. As an example, in the Stephen Ezell wiretap investigation conducted in November and December 2007, after his arrest, Ezell gave a proffer statement to investigators about other members of his drug conspiracy. After the proffer, Ezell went back to his jail cell and told other prisoners about the investigation and identified the other targets of the investigation. Reviewed jail calls revealed that word was spreading about who the remaining targets of

25

the investigation were, as well as some of the information investigators already have about the other targets of the investigation.

Officer Taylor also explained that search warrants would not provide sufficient evidence, in part because investigators did not know where drugs could be seized. Execution of a search warrant would also serve to alert the Target Subjects to the investigation.

Each of the trial courts concluded that the Initial Applications satisfied the requisite necessity prong of the Wiretap Statute. The Rutherford County trial court noted specifically that "[t]he fact this investigation had six (6) Confidential Sources giving information, which was verified in the investigation, shows the wiretaps were not the initial step in the criminal investigation." Significantly, the Davidson County trial court's order denying the Defendants' motions to suppress includes the following:

> [T]he portion of the Application titled "Consideration of Alternative Investigative Procedures" mirrors the same titled portions in the Moore applications, which were considered by this Court during the pre-trial motions, and ultimately found by the Tennessee Court of Criminal Appeals to contain sufficient "statement[s] as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous" in compliance with T.C.A. § 40-6-304(a)(3).
>
> Accordingly, this court finds that the State has met its burden in showing the necessity of the wire surveillance in that it demonstrated that other methods of investigation failed or appear unlikely to succeed if tried in the initial four Applications that provided the bases for the [succeeding] Applications, all of which contained additional information about necessity as the investigation progressed.

Although we do not have before us the applications considered by this Court in Moore, the Defendants do not challenge the Davidson County trial court's comparison.[19] Accordingly,

---

[19] The Davidson County trial court also noted in its order denying the Defendants' motions to suppress that "Officer Taylor testified that the wording used in the wiretap applications at issue in this case are very similar to the wiretap applications that were reviewed on appeal in State v. Moore."

we accept as accurate the Davidson County trial court's finding that the two sets of applications "mirror" each other in addressing the requisite necessity prong.[20]

In Moore, this Court considered three applications for wiretaps submitted in conjunction with an investigation into drug trafficking. The defendant entered guilty pleas to several drug offenses and reserved certified questions of law, including whether the applications "failed to demonstrate the necessity of electronic surveillance as required by Tennessee Code Annotated section 40-6-304(a)(3)." Id. at 516. In analyzing this issue, this Court first noted that the applications contained "an extensive necessity section discussing the unfeasibility of further physical surveillance, use of [confidential informants], infiltration by undercover officers, general questioning, search warrants, and review and analysis of telephone records." Id. at 526 (footnote omitted). We then noted the applications' references to particular difficulties that law enforcement had encountered during the investigation, including a traffic stop of one of the targets and his resulting conclusion that he was being followed; the confidential informants' limited knowledge about all of the involved customers and suppliers; a target's wariness around one of the confidential informants because the target was aware of the informant's pending criminal charges; and the failure of the investigation to discover information about specific drug activity at suspect locations. Accordingly, we concluded that the specific application at issue, which targeted the defendant's phone, "set[] out, in detail, both general information about the difficulties involved in investigating a large drug trafficking organization and 'particular facts of the case at hand which would indicate that wiretaps are not being routinely employed as the initial step in criminal investigation.'" Id. at 527 (quoting Landmesser, 553 F.2d at 20) (internal quotation marks omitted). Rejecting the defendant's contention that the application failed to satisfy the requisite necessity prong, we held as follows:

> Once his involvement became known [through previous wiretaps of others' phones], the police did not attempt to investigate the Defendant using

---

[20] We emphasize that we do *not* understand the Davidson County trial court's use of the term "mirror" to mean that the applications at issue in this case are identical to the Moore applications. As set forth above, the instant applications contained detailed explanations about why wiretaps were necessary, including references to specific facts unique to the instant investigation. Therefore, the Defendants' reliance on United States v. Blackmon, 273 F.3d 1204 (9th Cir. 2001), and United States v. Carneiro, 861 F.2d 1171 (9th Cir. 1988), is misplaced. In those two Ninth Circuit cases, the applications' requisite necessity sections were "cut and pasted" from previous applications. The record before us demonstrates that Officer Taylor did not simply duplicate the Moore applications in preparing the requisite necessity sections of the instant applications. Rather, it appears that he followed the same detailed format. Indeed, the Davidson County trial court specifically noted that "Officer Taylor testified that the wording used in the wiretap applications at issue in this case were very similar to the wiretap applications that were reviewed on appeal in State v. Moore."

any alternative techniques. Wiretaps were not employed as the initial step in the police's investigation of the Defendant's drug-trafficking organization, however, nor do we have any evidence that the police employed them "routinely," as forbidden by Giordano.

The Defendant notes, correctly, that the police "took . . . no substantive investigative action other than wiretapping . . . ." He also contends that "after the first wiretap . . . [the police] made no good faith effort to augment [ ] requisite necessity." The Wiretap Act, however, does not require the police to do so, provided they explain "why [other investigative techniques] reasonably appear to be unlikely to succeed of tried or to be too dangerous." See Tenn. Code Ann. § 40-6-304(a)(3). In our view, again, the information contained in previous wiretap applications and properly incorporated by reference into the 507-5291 application [to tap the Defendant's phone] retains its relevance and applicability due to the Defendant's suspected membership in David Moore and Brown's drug-trafficking organization.

Finally, the Defendant contends that the wiretap of his phone lacked necessity because previous wiretaps and resulting surveillance revealed a transfer of one kilogram of cocaine from the Defendant to David Moore, who in turn delivered it to Brown. A description of this incident appears in the probable cause section of the 507-5291 application. The Defendant argues that the police, in declining to arrest David Moore, Brown, and the Defendant, deliberately avoided alternate investigative techniques, such as immediate arrest, for the purpose of "stockpiling tape for use in prosecution." As stated by the [wiretap] orders in this case, however, the investigation had as its objective not merely the discovery of some criminal activity by Brown, David Moore, and the Defendant, but, among other things, "[t]he nature, extent, and method of operation" of the suspects' drug-trafficking business and the "identities and roles of . . . co-conspirators." Officer Taylor's applications substantiated his belief that such an immediate arrest would have jeopardized the discovery of further information about the Defendant's drug-trafficking organization. The State has thus demonstrated the requisite necessity for the achievement of the applications's stated goals, as borne out by the later arrest of the Defendant along with his previously unknown suppliers Mejia and Lemus. This issue is without merit.

Id. at 528.

We hold that the Initial Applications satisfied the requisite necessity prong as that prong was elucidated in <u>Moore</u>. As Officer Taylor did in <u>Moore</u>, he explained in the Initial Applications the shortcomings of traditional investigative techniques if applied to the investigation of this major drug-trafficking organization, including specific facts and specific examples. The Initial Applications also indicated that investigators did not seek the wiretaps at the commencement of the investigation into the drug-trafficking conspiracy/organization, but that they first tried alternative investigative methods and found they would not meet the target goals of the investigation. See <u>United States v. Kelley</u>, 596 F.Supp.2d 1132, 1147 (E.D. Tenn. 2009). Although the Defendants complain on appeal that the Initial Applications do not satisfy the "requisite necessity" requirement because they contain merely conclusory statements by Officer Taylor based solely on his past experience rather than actual, failed efforts to utilize other investigative techniques in the instant cases, our close review of the Initial Applications, including but not limited to the averments set forth above, convinces us otherwise.

The Defendants also assert that, contrary to Officer Taylor's statements, law enforcement had a ready, willing and able insider in Dady if they had but arranged a buy from him, arrested him, and used him as a cooperating insider. The Defendants point to Dady's prior cooperation in a federal prosecution as indicative of his potential use to the investigation in the instant case. However, the excerpts set forth above explain that this technique was considered, but rejected, and the reasons for opting out of this approach were explained. The Defendants also complain about "the State's failure to fully exploit the potential use of CS-1 and CS-6 . . . to make buys." As the federal courts have made clear, however,

> courts will not invalidate a wiretap order simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not. It is enough if the affidavit explains the prospective or retrospective failure of several investigative techniques that reasonably suggest themselves.

<u>United States v. Hyde</u>, 574 F.2d 856, 867 (5th Cir. 1978); <u>see also</u> <u>United States v. Carrillo</u>, 123 F.Supp.2d 1223, 1245 (D. Colo. 2000) ("After-the-fact suggestions by defense attorneys as to how an investigation might have been handled are entitled to little weight in the analysis"). The Defendants are entitled to no relief on this basis.

In a related issue, the Defendants contend in their final certified question that the Initial Applications "contain omissions and material misstatements that undercut any showing of requisite necessity for the wiretaps." The thrust of the Defendants' contention is that Officer Taylor failed to inform the Issuing Court about Dady's previous cooperation in a federal drug-trafficking prosecution, and that he thereby misrepresented the potential efficacy of using Dady as an undercover asset so as to strengthen Officer Taylor's claim that such a traditional investigative technique would not be successful and that the requested wiretaps were necessary. Specifically, the Defendants point to the following averments made by Officer Taylor in the First Dady Application, the King Application, and the Lockhart Application:

> []. CS-4 is correct in his statement about Bruce Dady being arrested in a cocaine conspiracy with "TI" or "TIP." I was involved in that investigation and TIP was Totally Independent Productions that belonged to Tim Booker and Terrell McMurray. Bruce Dady was getting kilograms of cocaine from Booker and McMurray. Dady eventually pled guilty and was sentenced on June 16, 2001 to 25 months in the Federal Department of Corrections.

and

> After discussing the situation with other investigators, it was agreed that it would be detrimental to the investigation to arrest Dady with 200 or 300 pounds of marijuana. It is feared that the arrest of Dady would cause the other Target Subjects to change their telephone numbers and/or change the way they buy, transport, store and sell the marijuana for fear Dady would cooperate with law enforcement.

The Defendants argue that Officer Taylor "failed to report complete and accurate information about Dady's 2001 drug conviction," specifically, the extent to which Dady cooperated with law enforcement. The Defendants posit that, had Officer Taylor been fully forthcoming with accurate information about Dady's significant cooperation in his federal prosecution, the Initial Applications would not have satisfied the "requisite necessity" prong. Accordingly, the Defendants claim that Officer Dady misrepresented the facts to the Issuing Court.

30

The Defendants make this argument because our supreme court has made clear that "a fraudulent misrepresentation of a material fact will invalidate a search warrant," State v. Little, 560 S.W.2d 403, 406 (Tenn. 1978) (citations omitted), and that

> there are two circumstances that authorize the impeachment of an affidavit sufficient on its face, (1) a false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause, and (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that [the] affiant did not have reasonable grounds for believing it, at that time.

Id. at 407; see also Franks v. Delaware, 438 U.S. 154, 155-56 (1978) (holding that Fourth Amendment requires exclusion of evidence obtained pursuant to warrant issued on probable cause based on false statements made knowingly and intentionally or with reckless disregard for the truth).

Each of the trial courts held an evidentiary hearing at which Officer Taylor testified, in large part about the extent of his knowledge about Dady and the federal prosecution of Dady, in which Officer Taylor had participated. We will summarize here, chronologically, the relevant testimony adduced in each court and the trial courts' rulings.

Sumner County

Officer Taylor acknowledged that he was involved in the federal investigation of Bruce Dady that resulted in Dady's 2001 conviction in federal court. The investigation was "coordinated nationwide with California and Ohio and several other states." Officer Taylor was involved in "the Middle Tennessee portion of this investigation." As a result of wiretaps, Officer Taylor "intercepted" Dady. Thereafter, "[t]he decision was made to go to Bruce Dady prior to any indictment and try to get him to cooperate and see if he could do anything over and above what [they] had already accomplished with the wiretaps." Officer Taylor and another agent interviewed Dady and advised him that they had "proffer statements implicating him and six kilos of cocaine. And that if he wanted to help himself now would be the time to do it before there was an indictment and he was in jail and wasn't able to do anything proactive." Officer Taylor testified that Dady told them that he "hadn't done anything in years" and that he wanted to talk to his lawyer. A short time later, Officer Taylor was contacted by Dady's lawyer and they arranged a meeting. At the meeting, "the only thing [Dady] would tell [them] is what [they] already knew." Officer Taylor concluded the meeting after telling Dady's lawyer that the information Dady was offering was unacceptable.

Dady was subsequently indicted in federal court. Officer Taylor attended "formal proffer sessions set up with the U. S. Attorney's Office." Officer Taylor described Dady's responses as "pretty much the same" as he had obtained at the prior meeting. Officer Taylor testified, "It was clear that he wasn't giving us the kind of information that we felt like that he could give." After the agents left the room and Dady conferred with his lawyer, the meeting resumed, but, according to Officer Taylor, "there was never any information Mr. Dady gave that, when I was in there, that was helpful to us, and the proffer session ended." Officer Taylor testified that he was not involved in Dady's eventual sentencing in the case.

On cross-examination, Officer Taylor stated that he was first involved in a wiretap investigation in 1999. He had since been involved in approximately 200 applications for wiretaps or extensions thereof. Asked about the frequency with which the Task Force relied on wiretaps for its Davidson County investigations, he answered,

> I did a check. When an investigator starts an investigation and drug task force they assign a TF number to it so they can track all the paperwork and everything out of that investigation. From 2007, 2008, 2009, 2010, there were like 270-something cases started and we ran four wiretaps.

He clarified that they ran the wiretaps in four cases since 2007. He also acknowledged that he was usually the affiant for wiretap applications by the Task Force in Davidson County.

Asked about his knowledge of motions for reduction of sentence filed in federal court, such as was filed in the federal case against Dady, Officer Taylor responded,

> according to my understanding of the Middle District of the U. S. Attorney's office, that a [motion for reduction] is given out pretty much when somebody comes in and tells them, hey, I'm buying dope from this guy and I'm going to plead guilty, that they give a [motion for] reduction for that.

He denied knowing that a motion for reduction was filed "when somebody has, basically, successfully cooperated with the government." He also denied knowing the terms of the "proffer letter" that the federal government offered to Dady. He also stated that he did not attend Dady's sentencing hearing. He did not recall how he came to learn about the federal sentence that Dady eventually received.

Asked why they decided not to attempt a "buy and bust" from Dady in order to "flip" him into an asset to the instant investigation against the Defendants and others, Officer Taylor responded,

Well, it's been my experience in 28 years of doing these things that even if you arrest somebody with 300 pounds in the State system, unless they immediately agree to go take the money back to whoever they got the 300 pounds [from] or go order up 300 pounds more from whoever they got it from, then you're pretty much stuck with that person and 300 pounds. If you arrest them and they go to jail and they decide a month later they want to cooperate, word[']s out, nobody's going to deal with them. Just because they sit down and tell you, hey, I got this from Jeffrey King – state doesn't prosecute those cases[.]

On the basis of this proof, the Sumner County trial court ruled as follows:

This Court places great weight and gives much credibility to the testimony of Phillip Taylor concerning his experience in wiretapping investigations as set out in the Applications and with his personal experience with Bruce Dady in trying to get him to cooperate in a large scale drug investigation – an experience that revealed an attitude of non-cooperation by Dady. The Court finds that Taylor was not aware of Dady's later cooperation with the FBI, and that he was not required to contact the FBI, DEA, or federal records in making the decision about the prospect of Dady's cooperation in this investigation. Further, the Court finds that the statements made by Taylor which are attacked by the Defendants were not "intentionally misleading" nor "recklessly included" resulting in the necessity of voiding the Applications and suppressing the evidence from the wiretaps under T.C.A. § 40-6-304(h)(1).[21] Taylor's personal experience with Dady definitely satisfied the requirement

---

[21] Rather than analyzing whether the wiretaps were invalid under the Franks/Little framework, the Sumner County trial court relied on the provision of Tennessee's wiretap statute that provides as follows:

Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the state of Tennessee or a political subdivision of the state may move to suppress the contents of any intercepted wire, oral or electronic communication, or evidence derived therefrom, on the grounds that:

(A) The communication was unlawfully intercepted;

(B) The order of authorization under which it was intercepted is insufficient on its face; or

(C) The interception was not made in conformity with the order of authorization.

Tenn. Code Ann. § 40-6-304(h)(1).

33

that "[n]ormal investigative procedures . . . <u>reasonably appear</u> to be unlikely to succeed." (Emphasis supplied.)

The Sumner County trial court denied the Defendants' motions to suppress on this basis.

<u>Davidson County</u>

Officer Taylor's testimony at the Davidson County hearing was largely consistent with his previous testimony at the Sumner County hearing. Asked about his previous involvement with the federal investigation into Dady, and asked if he researched the results of that federal investigation into Dady in conjunction with commencing the instant investigation, he testified, "Yes. I found out that he had pled guilty to two kilograms – distribution of two kilograms of cocaine and received a twenty-four-month [sic] sentence."

On cross-examination, Officer Taylor testified that, in the federal case against Dady, Officer Taylor was aware that Dady was originally facing a ten-year mandatory sentence. When asked about his reaction to Dady's eventual sentence of two years, Officer Taylor testified, "I've been doing this for thirty years, and sentences don't surprise me any more." He maintained that, at the time, he was not aware that Dady had provided "substantial cooperation."[22] He added, "why [the federal prosecutor] decided to let him plead to twenty-five months, there could have been a multitude of reasons. It really didn't raise any red flags for me [to assume Dady's significant degree of cooperation] because I know what the system is like."

Officer Taylor also explained that the federal investigation and the instant investigation were so different as to make not credible the Defendants' argument that Dady's part in the federal investigation could have been replicated in the instant investigation:

> You're talking about two different circumstances. One, we're going to have to – and there again you're talking about a legal issue. We're going to have to move in once we purchase [200] or 300 pounds of marijuana. We'll have to take him [Dady] into custody and whoever else is involved and get our money back and go from there. Now, whether you can do that – whether we could have done that in a covert situation where nobody would know that this had happened other than us and Mr. Dady and whoever he was with and his

---

[22] <u>See</u> 18 U.S.C. § 3553(e) (2010) ("Upon motion of the Government, the court shall have the authority to impose a sentence below a level established by statute as a minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense.").

suppliers, whoever fronted the marijuana to him if it had been fronted that expected payment and didn't get it, whether they would have suspected anything is probably a pretty good stretch. But in the other circumstance where we went to him in the other [federal] case all the main targets had been arrested. The investigation was – the covert investigation wiretap was over. We were going out and picking up. In that case Mr. Dady, even though you want to classify him as a major dealer and should have gotten ten years, he was one of the minor players in that cocaine distribution operation. So we were trying to flip him – give him an opportunity to flip ahead of time to become a cooperating witness, not an informant as such but just a cooperating witness against the main targets that we already had in custody. That's a little different circumstance than not having anything on the major targets and expecting to take off one little guy down here in – one of the other players (indicating) and hope he flips and is able to give you the whole organization. So you're really comparing two different situations of two different investigative techniques to try and make them mesh and they just don't.

The following colloquy ensued:

Q. But law enforcement does do controlled sale deliveries to defendants and not arrest them and approach them later and ask for their help, correct?

A. If it can be done that way, yes. In this case it couldn't be done that way.

Q. You're saying it couldn't be done this way because of the money?

A. Absolutely.

Q. And you say in other parts of the application one of the reasons it wasn't done is because you didn't have the money to front that operation, correct?

A. Well, right. To purchase [200] or 300 pounds or 300 pounds or more pounds to put him in a Class A violator, no, we don't have that kind of money to let walk, no.

The Davidson County trial court concluded that the Defendants had not met their burden of demonstrating that they were entitled to relief under Franks or Little.

35

During the Rutherford County hearing, Officer Taylor explained that, after the instant motions to suppress had been filed, he reviewed the affidavit for the downward departure that supported the imposition of the reduced sentence in Dady's federal case. That affidavit, together with the application for a wiretap filed by the U. S. Attorney's office in another investigation, revealed that Dady had provided substantial cooperation in the federal investigation into Stephen Braswell. Officer Taylor testified that he was not aware of Dady's participation in the Braswell investigation at the time he prepared the Initial Applications.

The Rutherford County trial court concluded that Officer Taylor "did become aware of Bruce Dady's actions in a previous Federal case but not until after the [instant] applications had already been submitted. Therefore, the Defendant's claim of an intentional omission of facts is without merit." The trial court also rejected the Defendant J. King's claim that Officer Taylor's statements were made recklessly and, accordingly, denied Defendant J. King's motion to suppress on this basis.

## Analysis

In their brief to this Court, the Defendants argue as follows:

> Certified court documents from Dady's federal case tell the full story of Dady's historic tendencies when approached by law enforcement – cooperate early and extensively. As public records demonstrate, Dady cooperated immediately (pre-indictment), and his cooperation was substantial, truthful, reliable and led to the prosecution of an additional 33 defendants in a large drug conspiracy stemming from Texas to Tennessee (the Brassel [sic] case).
>
> . . . .
>
> Despite the public availability of all of this information *and* despite Affiant Taylor's hands-on, personal involvement in Dady's federal case, Taylor crafted Applications suggesting that, if law enforcement confronted Bruce Dady, it would foil the investigation.
>
> Affiant Taylor felt compelled to tell the issuing court about his personal knowledge of Dady's conviction for purposes of corroborating a confidential source, but he omitted important information known (or reasonably known) to him which was critical to a determination of necessity. The material omission

set forth herein contradicts a significant misstatement (an intentional or reckless misstatement) about Bruce Dady in the "alternative techniques" section of the Applications – that he would not cooperate.

(Citations omitted).

We are not persuaded. First, all three of the trial courts expressly or impliedly found Officer Taylor's testimony credible. We defer to these credibility determinations. Accordingly, the Defendants have not demonstrated that they are entitled to relief under Franks or Little. Second, the Defendants' argument, if credited, would place a burden on law enforcement to research all other cases in which a target was involved in an attempt to determine the target's past levels of cooperation with law enforcement and prosecutions. The Defendants have cited us to no authority imposing such a burden, and we decline to adopt any such requirement. Third, even if Officer Taylor had conducted such research, the Defendants' argument requires that Officer Taylor or the Issuing Court then had to draw the conclusion that, based on Dady's past episode of cooperation, the instant investigation should not go forward in seeking wiretaps without first attempting to turn Dady into an undercover asset. Again, the Defendants cite us to no authority for the proposition that an affiant cannot establish the "requisite necessity" prong in light of a target's past cooperation without first trying to turn the target into an undercover asset and, thereby, potentially placing the entire investigation at risk. Therefore, we decline to impose any such requirement.

For these reasons, the Defendants are entitled to no relief on this basis.

*Fruit of the Poisonous Tree*

The Defendants contend that the wiretaps resulting from the Initial Applications ("the Initial Wiretaps") were illegal and that, accordingly, all subsequent wiretaps, which relied upon evidence gathered during the Initial Wiretaps, were also illegal as "fruits of the poisonous tree." Because we have held that the Initial Wiretaps were not illegal, the Defendants are not entitled to relief on this basis.

*The Issuing Court Acted as a "Rubber Stamp"*

The Defendants claim that "[t]here were several times during the issuance and supervision of these 23 wiretaps that the [I]ssuing Court acted as a rubber stamp for law enforcement rather than as a neutral and detached enforcer of the wiretap statute and upholder of the Constitution." The Defendants then refer to the application for the second extension of surveillance on the Second Dady Phone that Officer Taylor failed to sign but that the Issuing Court granted on December 9, 2008; the application for the third extension

37

of surveillance on the Lockhart Phone that included an incorrect probable cause section but that the Issuing Court granted on January 6, 2009 (the mistake was later corrected by Officer Taylor); the Issuing Court's failure to terminate a wiretap on another Dady phone after two ten-day reports submitted after January 20, 2009, indicated that nothing productive was occurring on the phone; the Issuing Court's grant of a February 6, 2009, application for an extension although "there were no calls since January 30, 2009"; and the Issuing Court's grant on October 27, 2008, of an application for a wiretap on a phone that was out of minutes (collectively, "the Allegedly Invalid Applications").

The Defendants do not explain, however, how this Court concluding that the Issuing Court erred in granting the Allegedly Invalid Applications would be dispositive in these cases. As our supreme court has made clear, a certified question of law "is dispositive when the appellate court must either affirm the judgment of conviction or reverse and dismiss the charges." State v. Dailey, 235 S.W.3d 131, 134 (Tenn. 2007) (internal quotation marks and brackets omitted) (quoting State v. Walton, 41 S.W.3d 75, 96 (Tenn. 2001)). "This Court is not bound by the determination and agreement of the trial court, a defendant, and the State that a certified question of law is dispositive of the case." State v. Thompson, 131 S.W.3d 923, 925 (Tenn. Crim. App. 2003) (citing State v. Oliver, 30 S.W.3d 363, 364 (Tenn. Crim. App. 2000)). Rather, we "must make an independent determination that the certified question is dispositive." Dailey, 235 S.W.3d at 135 (citing State v. Preston, 759 S.W.2d 647, 651 (Tenn. 1988)). Moreover, this Court does not have jurisdiction to decide certified questions that we determine to be non-dispositive. See Walton, 41 S.W.3d at 96 (citing Preston, 759 S.W.2d at 651); State v. Guy Steven Cathey, No. M2011-00438-CCA-R3-CD, 2011 WL 6020553, at *2 (Tenn. Crim. App. Dec. 5, 2011) (citations omitted), perm. app. denied (Tenn. Apr. 18, 2012).

When a defendant reserves a certified question regarding the evidence obtained through an allegedly illegal search, the question is not dispositive if the State has other evidence with which to prosecute the defendant. See, e.g., Walton, 41 S.W.3d at 96 (holding certified question regarding the admissibility of the defendant's incriminating statements non-dispositive because the record contained other incriminating evidence); State v. Brown, No. M2004-02101-CCA-R3-CD, 2005 WL 2139815, at *5 (Tenn. Crim. App. Aug. 30, 2005) (holding certified question regarding validity of search warrant non-dispositive because the State had incriminating evidence gathered from other sources), perm. app. denied (Tenn. Feb. 6, 2006); State v. Michael Kennedy, No. W2001-03107-CCA-R3-CD, 2003 WL 402798, at *3-4 (Tenn. Crim. App. Feb. 21, 2003) (holding validity of consent search non-dispositive where victim could also testify to defendant's possession of victim's property), perm. app. denied (Tenn. May 27, 2003). "When the record contains incriminating evidence apart from that challenged through the certified question, the appellate court must dismiss the appeal because the certified question is not dispositive." Maurice Edward Carter v. State,

No. M2012-01843-CCA-R3-PC, 2013 WL 3023093, at *5 (Tenn. Crim. App. June 14, 2013) (citing Dailey, 235 S.W.3d at 135-36).

In this case, it is clear that the prosecution amassed evidence against the Defendants from sources other than those obtained through the Issuing Court's grants of the Allegedly Invalid Applications. For instance, the record on appeal contains a copy of an affidavit in support of search warrant prepared by Investigator Don Hardin and presented to Sumner County Circuit Court Judge C. L. Rogers on March 9, 2009. The affidavit contains 160 numbered paragraphs containing averments supporting the application for a search warrant and sets out in great detail a wealth of incriminating evidence gathered from a multitude of sources, including the following:

10. Since November 5, 2008, Dustin Ellis and Jeffrey King have talked on the phone about getting shipments of marijuana and about money that they lost while they were trying to get marijuana. On November 13, 2008,[23] Jeffrey King and Dustin Ellis talked about a thousand pound shipment of marijuana coming from Mexico. Ellis told King that King and Ellis could get five hundred pounds of the marijuana. On November 14, 2008, Ellis and King expected that the shipment of five hundred pounds of marijuana would arrive in Nashville. Jeffrey King, who intercepted phone calls showed was out of town, called Billy Painter and told Painter that King needed Painter to take the money to pay for the marijuana to Ellis.

. . . .

12. On January 2, 2009,[24] investigators learned through intercepted conversations that Jeffrey King (m/w, dob 7/5/79) was attempting to gather money for past Marijuana sales from his clients to pay his supplier. Jeffrey King told Dustin Ellis (m/w, dob 5-26-75) to meet up with his brother Kasey King (m/w, dob 4/13/77) and give him the money that he owed Jeffrey King.

. . . .

16. On January 2, 2009, surveillance followed Brent Butler and Kasey King to 1007 Blakewood Court in Joelton and met with Herbert Cantrell. They unloaded the Marijuana from the truck at this residence. Jeffrey King arrived

_____

[23] This date is prior to any of the Allegedly Invalid Applications.

[24] This date is prior to all but two of the Allegedly Invalid Applications.

at this location in his Chevy Pickup TN (917PYQ). Kasey King left 1007 Blakewood Court in his Chevy Blazer TN (646SNN).

. . . .

18. On January 3, 2009,[25] we learned through intercepted conversations that Dustin Ellis had talked to Jeffrey King about getting a quantity of Marijuana. Jeffrey King told Dustin Ellis that his brother would call him. Kasey King and Dustin Ellis made arrangements to make the transaction at 91 Vandiver Street in Madison. Kasey King owns the Bar called Just One More located at 91 Vandiver Drive in Madison.

(Footnotes added). Additionally, during the Davidson County guilty pleas, the prosecutor included the following in his statement of the proof supporting the Defendants' guilty pleas:

[T]he facts would show on December 15, 2008,[26] the defendant Jeffrey King directed the defendant Kasey King to deliver approximately twenty-seven pounds of marijuana to Bruce Dady. Police intercepted pursuant to wiretap conversations those directions. They observed – surveillance observed the defendant Kasey King pick up the marijuana from a stash house used by the conspiracy at 6960 Old Hickory Boulevard in Davidson County. They followed him to 138 Hardaway Drive where the marijuana was delivered to the co-defendant Bruce Dady.

As to Count 24 on both defendants, the facts would show on December 18th, 2008,[27] the defendant Jeffrey King and Kasey King were intercepted on wiretap conversations with their directions to make payments to a Carlos Montoya who was in town. He was agent for the Mexican connections of delivering drugs previously fronted. A payment of approximately [$8,000], more or less, was made and delivered on orders of the defendant Jeffrey King through Kasey King. Surveillance confirmed the meeting. Police officers observed the meeting between the subjects and confirmed the – that Carlos Montoya was here.

---

[25] This date is prior to all but two of the Allegedly Invalid Applications.

[26] This date is prior to all but one of the Allegedly Invalid Applications.

[27] This date is prior to all but one of the Allegedly Invalid Applications.

The Defendants fail to explain how, in light of the State's other evidence, their convictions must be reversed and their cases dismissed were we to determine that the Issuing Court erred in granting the Allegedly Invalid Applications. Accordingly, we hold that this certified question is not dispositive. Therefore, we may not address it.

### Unsigned Affidavit

The Defendants claim that their motions to suppress should have been granted because "the notarized but unsigned affidavit requesting a second extension of the wiretap for telephone number (615) 584-6075 was statutorily deficient to support interception." For the same reasons set forth above, we hold that this question is not dispositive. Therefore, we may not address it.

### Interception of (615) 653-2294

The Defendants claim that the interception of telephone number (615) 653-2294 should not have been ordered on November 4, 2008, because the application "lacked probable cause to justify interception . . . because they [sic] failed to make a sufficient link between the phone and suspected criminal activity or the targets of the investigation." Consequently, the Defendants assert, "all of the extensions of this wiretap and all other phones discovered through this wiretap must be suppressed" in addition to "all other fruits flowing from" this illegal interception. That is, the Defendants assert that *some* of the evidence against them must be suppressed as a result of the allegedly illegal wiretap of this telephone. For the reasons set forth above, we hold that this certified question is not dispositive. Accordingly, we may not address it.

### Interception of (615) 818-2839

The Defendants crafted the same certified question regarding the interception of telephone number (615) 818-2839, which was ordered to be intercepted on January 8, 2009, as they crafted for the interception of telephone number (615) 652-2294. Similarly, they call for the suppression of *some* of the evidence against them. For the reasons set forth above, we hold that this certified question is not dispositive. Accordingly, we may not address it.

### Applications for Extensions

In their next certified question, the Defendants assert that "the Applications for extensions of the wiretaps failed to articulate a statutorily sanctioned purpose justifying continuing interception." In their brief, the Defendants argue as follows:

1.  For Bruce Dady's phone number (615) 916-9412 . . . , there are 2 ten day reports remarking that nothing productive is happening on the phone.  The State should have terminated interception, but did not.

2.  For Jeffrey King's phone number (615) 818-2839 . . . , there were no calls at all since January 30, 2009, yet that fact was not disclosed in the February 6, 2009 Application for a First Extension. . . . No extension should have been sought.

3.  The State did not have grounds to seek an Application for Interception of Lockhart's phone number (706) 500-7055 . . . since the phone was inoperable at the time the Application was sought.  A November 6, 2008 10 day report reveals that the phone was out of minutes and had not been recently used when the wiretap Application was filed.

The Defendants further contend that, "[i]n each of the above instances, the State should have refrained from seeking wiretap authorization and/or should have voluntarily terminated the interception early.  The State did neither, and that conduct violated the letter and spirit of Title III and the Wiretap and Electronic Surveillance Act of 1994."

The Defendants fail to explain how this question is dispositive, and we hold that it is not.  Accordingly, we may not address it.

### Conclusion

We have determined that the Defendants are entitled to no relief on the basis of the certified questions reserved in their conditional guilty pleas.  Accordingly, we affirm the judgments of conviction entered against each of the Defendants by the Rutherford, Davidson, and Sumner County trial courts.

_____
JEFFREY S. BIVINS, JUDGE